Albert R. **DICKS**, Plaintiff-Appellant,

v.

Frank D. **CLEAVER**, Defendant-Appellee.

Rodney W. **NIELSEN**, Plaintiff-Appellant,

v.

Frank D. **CLEAVER**, Defendant-Appellee.

No. 28734.

United States Court of Appeals,
Fifth Circuit.

Sept. 15, 1970.

Rehearing Denied and Rehearing En Banc Denied Oct. 28, 1970.

Landman Teller, Vicksburg, Miss., for appellants.

Lawrence J. Franck, Jackson, Miss., Lee Davis Thames, Vicksburg, Miss., for appellee.

Before JOHN R. BROWN, Chief Judge, and BELL and INGRAHAM, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The problem here is whether a jury, required under the classic test for estoppel to decide whether a party has been misled into action by the adversary, is entitled to know the facts bearing upon who the real party is. More specifically it is whether, in an otherwise run-of-the-mill automobile tail-gating damage suit, the plaintiffs were entitled to prove that the same insurance company was both the workmen's compensation insurer and automobile liability insurer of the named defendant. We hold such testimony to have been here admissible and reverse.

The injuries occurred December 30, 1964, when the automobile driven by defendant-appellee Cleaver (owned by him or his company), struck the rear-end of an oil truck in Mississippi injuring each of the plaintiff-appellants, Dicks and Nielsen, as well as Cleaver. In the trial of the suit instituted three years later the big issue centered around the status of the plaintiffs *vis-a-vis* Cleaver,[1] that is whether each was then an employee of Cleaver or just a former employee so that on the trip in question each of the three out of self-interest was severally engaged in seeking employment for the two individuals and contracting work for Cleaver's company. If they were employees their rights were limited to the applicable Workmen's Compensation Act and the existence of the employer-employee relationship would be an absolute bar to the Mississippi damage suit. After first instructing the jury that, as a

---

1. Throughout we treat Cleaver and his contracting company as the same.

matter of law, Cleaver was guilty of negligence proximately causing the serious injuries, the Court submitted the critical question of status to the jury under a general charge calling for a general verdict. The Court in effect instructed that to return a verdict for the plaintiff the jury must decide two things: (1) that the plaintiff was *not* an employee of Cleaver, and if *not* an employee (2) the plaintiff was not estopped to deny the existence of the employer-employee relationship. On (1) the plaintiffs had the burden of proof and on (2) it was on the defendant. With knowledge or the means of knowledge forever concealed as to what really was decided by the general verdict for the defendant, the jury may have held that (a) the plaintiff was an employee (which ended it right then and there, or (b) they were *not* employees *but* (c) they were estopped to deny existence of the employee status.

Attacking the judgment for the defendant on the verdict, the plaintiffs urge that there was insufficient evidence to warrant submission of the issue of employment or estoppel and, failing in that, the Court erred in the admission of three exhibits, in the jury charge on credit for "compensation" benefits received and, as mentioned at the beginning the exclusion of testimony on the dual interest of Cleaver's insurer. We find no error in the admission of the exhibits or in the Court's perhaps needlessly complicated handling of the credit problem. On this record we conclude that there was evidence warranting the submission of the basic issue of employment status. Although the question may be much closer, we assume without deciding that, on this record, the evidence warranted the submission of estoppel. Since our reversal calls for the admission of additional testimony on estoppel which may well open up considerable exploration on the actions of Cleaver and others now unidentified, we make no forecast about the sufficiency of the record on any such retrial. With these holdings our discussion is much simplified.

Dicks and Nielsen were dragline operators who had worked for a number of years for Cleaver and his Minnesota based enterprises, engaged in construction jobs in Minnesota, Iowa, Nebraska and perhaps elsewhere in the Midwest. On December 17, 1964 the job at Sac City, Iowa was closed down for the winter because of the weather. There is no doubt that employment ceased as of December 17, 1964 and each of the plaintiffs returned to his home in Minnesota. As in the previous several years, however, each would automatically have been re-employed on application when work resumed. The plaintiffs had discussed among themselves the necessity of trying to find some work, presumably in the South. About Christmas time Cleaver decided that he was going to Arkansas to check into a possible contract job there. Cleaver talked to one of the two plaintiffs about his plans, and, at a minimum, he invited them to go along. The result was that the three decided to go South in two cars.

From here out things get a little fuzzy. Cleaver candidly admitted that during the discussions and prior to departure on the trip nothing was said about employment, pay or expenses. Indeed in his own words he "never said one word to them about the fact that they were going to be paid" for the trip and, from the viewpoint of the plaintiffs he acknowledged that they couldn't have known that they were on the payroll because he, Cleaver, "hadn't told them" because, on his own version, "the subject hadn't come up". After the event Cleaver asserted that he considered each to be on the payroll since he was taking them along to help evaluate prospective dirt moving jobs on which he might bid. At the same time Cleaver acknowledged that he knew the plaintiffs intended to try to work for themselves and needed transportation to do that. There was no word testimony from Cleaver that he advised the plaintiffs that they were to assist him and any such implications were denied categorically by each of the plaintiffs.

The ill-fated trip which began on December 28, 1964 was of short duration. The first stop was in Benton, Arkansas some 600 miles from the Iowa point of departure. The prospect Cleaver was to investigate turned out to be unacceptable even without a job-site inspection. From that contact Cleaver, if not all three, learned of possible prospective openings for work at the missile site near Slidell, Louisiana. En route they stopped at Dumas, Arkansas where they stayed overnight where the prospect for Dicks' individual employment did not materialize. It was then they apparently mutually agreed to cut down expenses as much as possible and Cleaver invited Nielsen and Dicks to ride down to Slidell in Cleaver's car rather than to use both cars. It was uncontradicted that up to the time of the accident, Cleaver had not paid all of the expenses. Plaintiffs insisted that each had paid all of his own and the most that Cleaver ever said was that he thought he paid for gasoline on one occasion in Arkansas and may have paid some or all of the motel bill at one of the stops.

Other factors cast a considerable doubt upon an employment relationship as the trial Judge's questions to Cleaver clearly reflected. First, there was no discussion about the basis for compensation, whether on an hourly rate and if so, what rate, the number of hours to be considered, or the like. In addition, there had been few if any occasions in the past when either of the plaintiffs had been used to inspect a job. And on this trip there was great uncertainty in Cleaver's own recollection whether one or both of them were with him at the time of his conference in Benton, Arkansas where, on review of the plans without job-site inspection, the prospect was turned down. The same doubt pervaded Cleaver's version that he was going into a new state (Arkansas) since some of the plaintiffs were likewise nonresidents. To this was added the fact that Cleaver also had been an experienced dragline operator, raising considerable question whether he needed advice from others.

But then came the accident of December 30, 1964 in which all three were injured and hospitalized for a number of days in the same hospital in Vicksburg, Mississippi. About January 12–14, 1965 while the plaintiffs were still in Vicksburg, a check was issued by Cleaver's wife and delivered to the wives of each of the plaintiffs.[2] In his Court testimony Cleaver could give few details concerning the instructions, if any, given by him to his wife concerning these checks. The regular ledgered type employees' earning record for each showed an entry, presumably by the bookkeeper in Iowa, for the amount of these checks broken down showing 40 hours work at $2.60 less withholding deductions. But the bookkeeper was unable to state where the 40 hours came from, what it was based upon, and acknowledged that with the trip beginning December 28, 1964, and the work week ending January 2, 1965 as reflected on the bookkeeping record, the time was much less than 40 hours.

But that is not the end of it. Bearing both upon employment status and estoppel is the factor of workmen's compensation benefits and reimbursement of medical expenses. Commencing in late January 1965 each of the plaintiffs received checks from Travelers Insurance Company apparently marked or identified simply as "compensation".[3] The record does not contain any of the usual claim forms, nor is there any testimony concerning a decision by anyone, whether Cleaver, the employer, or the insurer, Travelers, concerning the decision to pay

2. Check to Dicks was $90.63, that to Nielsen was $94.90.

3. The checks totaled:

| Name | No. Checks | Compensation | Medical Reimbursement |
|------|-----------|--------------|----------------------|
| Dicks | 48 | $2040.00 | $4553.58 |
| Nielsen | 66 | $3592.50 | $1079.20 |

compensation and medical benefits.[4] There was, however, extensive correspondence to and from Travelers and Mrs. Dicks about delay in the checks for reimbursement of medical expenses and the like. And on January 30, 1965 some person completely unidentified, but presumably representing Travelers, filled out by hand printing a questionnaire which Nielsen acknowledged signing, although he disclaimed any recollection of it.[5] By appropriate lines and boxes it states in effect that he was an employee of Cleaver at the time of the accident.

■ This is the state of the evidence on the employment-estoppel issue. Although as we stated earlier, there are many weaknesses casting a good deal of doubt upon Cleaver's postevent assertion of an employment status, we think that the evidence including that concerning the receipt of substantial compensation benefits warranted a jury submission on employment status. It may well be that this evidence led the jury to conclude that plaintiffs were employees. That finding would put an end to the case.

Unfortunately, this can never be known, so this—and unavoidably, even though perhaps unnecessarily,[6]—sets the stage for problems relating to estoppel. That brings us to the question posed at the outset concerning admissibility of testimony showing that Travelers Insurance Company was both the workmen's compensation insurer and the automobile liability insurer for Cleaver.

■ As the proffer, F.R.Civ. 43(c), deliberately made out of the presence of the jury was quite sketchy, we determined on argument that it was in the interest of good administration to have this matter clarified by the Trial Judge since it was undisputed by counsel that this had been the subject of repeated discussions in pre-trial conferences but which, unfortunately, were not stenographically recorded. Our approach was, of course, the sensible, practicable one we take on the civil rules. We insist upon real compliance to assure that the position of a party is brought articulately to the attention of the Trial Judge. But where the Judge on that defined position has made a ruling it is not necessary to go through all of the formalities of repeating it at every stage, so long as the record does show with certainty that the party adheres to the position previously urged and that the Court does likewise in its rulings.

Consequently, by letter-directive from our Clerk the Trial Judge was requested to construct a supplemental record. With the diligent cooperation and collabora-

---

4. As a matter of fact, except for an exchange of letters between Mrs. Dicks and the Minnesota Industrial Commission in April 1966, the record is bare as to the law of which State should apply, whether Minnesota, Iowa or Mississippi.

5. The record is virtually uncontradicted that Nielsen sustained severe injuries, including both a concussion and a brain contusion which, for a considerable period of time, had a quite perceptible effect on his mental awareness and capacity.

6. This case demonstrates again the great utility of special interrogatories used in conjunction with a general charge F.R. Civ.P. 49(a), but not, however, a general charge, general verdict and special questions under 49(b). See Brown, Federal Special Verdicts: the Doubt Eliminator, in proceedings of the Annual Judicial Conference, Tenth Judicial Circuit of the United States, 44 F.R.D. 245 at 338

(1967); with exactly the same general charge—to which no real exception was taken—as given the three critical findings could have been excised for both trial and appellate review by a verdict form for each plaintiff comprising three simple questions:

(1) Was Plaintiff an employee of Cleaver?  Yes ☐  No ☐

(2) If (1) is answered "No", then is plaintiff estopped to deny existence of an employer-employee relationship?  Yes ☐  No ☐

(3) What damages, if any, did plaintiff sustain resulting from the injuries of December 30, 1964?  $———

Had interrogatory (1) been answered "Yes" all of the questions in this case, except the sufficiency of the evidence on that issue would have been washed out.

tion of counsel, and often an appropriate hearing conference with them, the Judge did this. By the certificate of the District Judge it is now perfectly clear that in at least two, and probably three, pretrial conferences the plaintiffs expressly sought leave to prove on trial the existence of this dual insurance interest as it bore on estoppel. Each time, over the vigorous objection of the defendant, Cleaver, the Court declared such testimony to be inadmissible and sounded the positive caveat that were any such effort made on the trial before the jury it would result in an immediate mistrial. But equally positive was the judge's declaration that in the absence of this exclusionary ruling the evidence would have been admitted.[7]

In the course of these pre-trial conferences [8] it was Cleaver's position which the trial Judge adopted that since the plaintiffs disclaimed any purpose to prove that the payment of the compensation benefits constituted a scheme, agreement or fraud the evidence would not be admissible.[9]

7. The certificate reflects:
"A pre-trial conference was held on May 28, 1969. At that time, plaintiffs' counsel advised the Court that they desired to offer evidence of defendant's automobile liability insurance coverage, and that they intended and desired to prove that Travelers Insurance Company had both defendant's workmen's compensation and automobile liability coverage and that this fact was deemed to be material if the issue of estoppel was going to be submitted to the jury for consideration. * * * The Court thereupon advised plaintiffs' counsel that evidence of the existence of a policy of liability insurance issued by Travelers Insurance Company to defendant would not be admitted at the trial of the case.

* * * * *

"At the hearing in chambers on July 14, 1969, prior to the commencement of the trial, plaintiffs' counsel again advised the Court that they desired to prove that defendant carried an automobile liability insurance policy with Travelers Insurance Company. * * * (T)he Court thereupon again ruled that he did not consider such evidence relevant and would not permit its introduction at the trial of the case. The Court advised counsel that if there was any suggestion or mention made by or on behalf of plaintiffs before the jury that the defendant had automobile liability coverage he would declare a mistrial.

"The offer of proof in the trial (App. 264–268) was thereupon made under the provisions of Rule 43(c) F.R.C.P. in the absence of the jury, under the Court's ruling that this evidence was not going to be admitted for consideration by the jury in this case. *The testimony thus offered would have been presented for the jury's consideration*

*had its reception been permitted by the Court."* (Emphasis supplied.)

8. The extent of Travelers' interest in the employment status issue and the effect of the payment and receipt of compensation benefits was demonstrated in the Court's earlier handling of Cleaver's motion for summary judgment, presumably on the ground that the acceptance of the compensation benefits precluded a suit altogether on the basis of waiver. It denied the motion for summary judgment on the condition that each plaintiff (and his counsel as surety) post a bond in the amount of the payments made, see note 3, *supra*, as follows:
"(a) if plaintiff recovers herein from the defendant [Cleaver] then plaintiff shall be liable to pay to Travelers * * * the sum of [see note 3, *supra*]
(b) if plaintiff does not herein recover because the jury concludes that at the time of the accident plaintiff was in the course of his employment [with Cleaver] then this obligation shall be void."
By condition (2) it in effect gave Travelers subrogation even though, on that finding, it was a volunteer and had no liability for compensation benefits.
Although, as we have stated there was no reversible error in handling credits, it could have been much more simple. The Judge could readily handle all resulting collateral source problems.

9. In the last pre-trial conference July 14, 1969 in response to plaintiffs' contention that the evidence would be relevant on the issue of estoppel, defendant's counsel stated "that unless plaintiffs were claiming that the defendant or his insurer had fraudulently induced plaintiffs to accept workmen's compensation benefits or entered into an agreement to pay them such benefits so as to preclude a common law action for damages, evidence of the mere existence of such a liability policy

The Trial Judge's restrictive limitation that admissibility would require a charge of fraud or one analogous to it is the pivotal question for us. For we can quickly put to one side the so-called usual rule which ordinarily forbids the admission of evidence concerning the existence of liability insurance.[10] But warranted as may be the often expressed concern [11] that such evidence inescapably causes so much harm that its utility for other purposes is outweighed by this danger, the law in its quest for truth has to recognize, as does Mississippi,[12] that there are occasions in which this exclusionary rule must give way where the fact of insurance has arguably an independent, substantive evidentiary relevance.

An outstanding example of the relevance of dual interest of an insurance company having a likely significant bearing upon the assertion of a claim or the conduct of the defense is Czaplicki v. SS Hoegh Silvercloud, 1956, 351 U.S. 525, 76 S.Ct. 946, 100 L.Ed. 1387, 1956 AMC 1465. Although the context is different and admissibility as such is not an issue, the principles are relevant. There is also the added ironic coincidence that there, as here, the dual insurer was the Travelers Insurance Company. There, Czaplicki, while employed as a longshoreman by the stevedoring company was injured on a Norwegian ship, when some wooden steps constructed by the contracting company broke. Travelers was the workmen's compensation insurer for the stevedoring contractor (Czaplicki's employer) but it was also the liability insurer for the contracting company. Following Travelers' formal notice of controversion the Deputy Commissioner made a formal award of benefits under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. By virtue of 33 U.S.C.A. § 933 (b) the acceptance of compensation under the award was an assignment to the insurer, Travelers, of "all right of the person entitled to compensation to recover damages against [a] third person." In later suits brought on the grounds of unseaworthiness and negligence against the (a) vessel and (b) the contracting company, the actions were dismissed on the ground that Czaplicki was not the proper party libellant since his acceptance of compensation under the award had operated as an irrevocable assign-

---

would not be relevant to any issue involved in the case." On plaintiffs' reiteration that "they were not undertaking to prove such conduct" the Court "thereupon again ruled that he did not consider such evidence relevant and would not permit its introduction at the trial of the case" (see p. 4, supplemental record).

10. Without determining whether, or to what extent the Federal Court is bound by State Rules on the admissibility of evidence (other than privileges), see Fed. R.Civ.P. 43(a), (c), and (e). Monarch Insurance Company v. Spach, 5th Cir., 1960, 281 F.2d 401. The Mississippi cases are quite positive as witness those stressed by Cleaver's counsel:

Lagrone v. Helman, 1958, 233 Miss. 654, 103 So.2d 365; Lancaster v. Lancaster, 1952, 213 Miss. 536, 57 So.2d 302; Petermann v. Gary, 1951, 210 Miss. 438, 49 So.2d 828; Odom v. Walker, 1943, 193 Miss. 862, 11 So.2d 452.

In a variety of situations Federal Courts in this Circuit have followed the State approach. See e. g., Socony Mobil Oil Company v. Taylor, 5th Cir., 1967, 388 F.2d 586; Sun Oil Company v. Pierce, 5th Cir., 1955, 224 F.2d 580; Ingalls Shipbuilding Corporation v. Trehern, 5th Cir., 1946, 155 F.2d 202; Shelby Mutual Insurance Company v. Phillips 1966, N.D.Miss., 260 F.Supp. 799.

11. Our extensive experience and that of the District Courts in Louisiana with that State's Direct Action Statute (La. R.S. 22:655, 1968) and the large number of jury verdicts for insurance company defendants justifies a considerable skepticism that fairly chosen jurors in a carefully, fairly conducted trial will necessarily be misled by hearing directly what many perhaps actually know—that there is some insurance in the case. See e. g., Clegg v. Hardware Mutual Casualty Co., 5 Cir., 1959, 264 F.2d 152; Lussan v. Grain Dealers Mutual Insurance Company, 5 Cir., 1960, 280 F.2d 491.

12. See Luke Construction Company v. Jernigan, 1965, 252 Miss. 9, 172 So.2d 392, where the Court held certificates of liability insurance were admissible for establishing a claimed agency relationship.

ment to Travelers. Although the question was one of statutory construction in the light of policies of the Longshoremen's Act the Court analyzed the conflict of interest presented—quite apart from any evil or fraudulent purpose—and held that this called for some adjustment to assure that the interests of the parties were adequately cared for. Paralleling in a lot of ways the situation which faced Travelers here with Cleaver, the Court concluded that an action by Travelers would, in effect, be an action against itself. That meant that "Czaplicki is the only person with sufficient adverse interest to bring suit * * *." Consequently in those circumstances the Court declared, " * * * the statute should be construed to allow Czaplicki to enforce, in his own name, the rights of action that were his originally." 351 U.S. 525, 531, 76 S.Ct. 946, 950, 100 L. Ed. 1387, 1394.

In many ways that is what is involved here. If Cleaver can make out the defense of employment the liability—now recognized to be absolute as a matter of law—is reduced to the certain and limited ceilings of the Compensation Act.[13] Moreover, either on the face of the stat-

| 13. | Iowa [1] | Minnesota [2] | Mississippi [3] |
|---|---|---|---|
| **Temporary Total Disability** | | | |
| Maximum weeks receivable | 300 | 350 | 450 weeks or $15,000.00 |
| Maximum weekly benefits | $18.00–$56.00 | $17.50–$70.00 | 66⅔% of average weekly wages |
| Maximum hospitalization, professional and medical reimbursement | reasonable | reasonable | Community standard for similar injury |
| **Permanent Total Disability** | | | |
| Maximum weeks receivable | 500 weeks or $23,750.00 | Until $25,000 is paid | 450 weeks or $15,000.00 |
| Maximum weekly benefits | $18–66⅔% of average weekly earnings | $17.50–$70.00 | 66⅔% of average weekly wages |
| Maximum hospitalization, professional and medical reimbursement | reasonable | reasonable | Community standard for similar injury |
| **Temporary Partial Disability** | | | |
| Maximum weeks receivable | 300 | 350 | 450 weeks or $15,000.00 |
| Maximum weekly benefits | $18.00–$56.00 | 66⅔% of the difference between amount laborer earned before and after incapacity | 66⅔% of the difference between amount laborer earned before and after incapacity |
| Maximum hospitalization, professional and medical reimbursement | reasonable | reasonable | Community standard for similar injury |

1. Based upon Iowa Code Annotated (Supp.1970) §§ 85.27, 85.33, 85.34, subd. 3, and 85.37.

2. Based upon the Minnesota Statutes Annotated (Supp.1970) § 176.101(1), (2), and (4).

3. Based upon the Mississippi Code Annotated (1969) §§ 6998–09(a), (b), (c), and 6998–11.

utes or as a practical matter in view of Travelers known solvency this is an exposure, not of Cleaver, but of Travelers, the workmen's compensation insurer alone. On the other hand, with liability now absolute—and no indication that on any responsible investigation made shortly after the event in early January 1965 anyone could have concluded otherwise without a trial—if the defense of employment failed, Cleaver had an unlimited exposure for serious injuries and it was this liability which Travelers also insured.[14]

In short, from the viewpoint of the legitimate, but nevertheless, self-interest of Travelers all would be simpler if the case could be handled as a workmen's compensation claim. That, of course, called for the existence of a status of direct employment.

With these opportunities and temptations of self-interest several things might occur. First it might be the basis for some sort of scheme, arrangement or plan by the insurer alone, insurer and assured, or either, deliberately to mislead the injured plaintiffs by trapping them into a compensation claim with its beguiling certainty. This would have been the sort of fraudulent scheme which the Trial Judge sensed would require full disclosure.

But it did not have to take that crude or crass form. To circumvent the assumed jury finding of non-employment Cleaver, the nominal defendant, asserted estoppel. This means that it is Travelers for itself—and Cleaver up to the dollar limits of the policy—which is urging that Cleaver was misled to his prejudice by action, silence or conduct of the injured men. Granted that in the usual situation in which the insurer simply takes up the liability of the assured this would include taking full advantage of any prejudice sustained by the assured, the

situation here is or may be quite different. Far from prejudicing Travelers—the only one really exposed on the compensation claim—this might well work to Travelers' substantial advantage by eliminating altogether the rather serious prospect—later given a judicial imprimatur—of unlimited exposure to the common law damages if employment status failed.

This brings us to the question of the *party* who was misled, if at all, or how or in what way any party was in fact misled. Was it really Cleaver? Did he have anything to do with it? Were any of the decisions consciously made by him?[15] Was Cleaver really conscious? Who was making the decisions? Who had the greater self-interest in making the decisions?—Cleaver or Travelers?

In this record there is no evidence that Cleaver did anything except report the accident. If it were Travelers who decided to commence voluntary payment of compensation it was hardly Cleaver who was misled. Likewise, if it were Travelers who decided that the case would better be handled as a compensation claim it was because of Travelers' decision. It was not a representation of either of the plaintiffs which misled either Travelers or its assured, Cleaver.

What the truth was no one knows because the Judge by the exclusionary ruling cut off the proof of fundamental facts which may have come to light upon a full exploration through vigorous cross-examination of Cleaver, who appeared as a witness ostensibly on his own, and not partly on Travelers', behalf. More than that, in the responsible manner in which these lawyers for both sides handled this by a ruling *in limine* in which the problem was brought to the Judge's attention at an early date and before inquiry in the jury's presence might infect the whole trial, we may look on this as it bore

---

14. The Trial Judge's supplemental certificate reflects that defense counsel stated at one time that the dollar policy limits were less than the amount in suit. How much less we do not know, and maybe

for Dicks and Nielsen they are really quite adequate.

15. We refer here to the handling of the compensation claim not the issuance of the "salary" checks on January 2, 1965.

upon trial preparation as well. The problem was the considered subject of at least two pre-trial conferences. The ultimate ruling already forecast twice before, was merely the vehicle by which the correctness of it could be reviewed by this Court on appeal. In the meantime, the Trial Court having made it with respect to the trial there was no basis for the plaintiffs to pursue it in pre-trial discovery which might well have precipitated inquiry as to Travelers' actions and the reasons therefor.

Keeping in mind that it is unusual, to say the least, for an employer to assert that it was misled by a potential employee with respect to the very existence of an employment relationship, it becomes directly relevant in determining the question of whether he was misled, or that he was or could have been misled, to know for a certainty who was taking the action, and who was making the decisions. Along this line, the proffer also undertook to prove through quoting from Cleaver's pre-trial discovery deposition that sometime in January 1965 at least one adjuster-investigator presumably from Travelers, was in Vicksburg in connection with the case. And clearly someone, obviously from Travelers, or its representatives took the questionnaire answers from Nielsen on January 30, 1965.

Had the jury known positively that Travelers was on both sides of the case and that it had conflicting interests depending on whether the injured men were or were not employees of Cleaver, it may well have decided that Cleaver was not misled at all. The jury may well have reasoned so because none of these actions were really his and that Travelers, behind the scene, could not have been misled because things were going its way. On the supposition we have to make under the enigma of the general charge-general verdict that the critical finding wrapped up in the verdict for the defendant was a finding of (a) non-employment but (b) estoppel, the error of the Court in the exclusion of this testimony had critical, decisive, and harmful consequences.

Reversed and remanded.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before JOHN R. BROWN, Chief Judge, and BELL and INGRAHAM, Circuit Judges.

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc,. (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.